Arthur E. Blyn, J.
Much has been written about the cost of dying. The role of the funeral parlors and the techniques used to encourage those who remain, after the deceased has left our troubled world, to order the most elaborate caskets and funerals have also been much commented upon. This situation can be even more painful when the costs are imposed upon one who claims not to be obligated for them. The case before the court deals with a suit by a funeral parlor against a brother of a deceased for a balance due on a bill for services rendered in the interment of the deceased.
The facts so far as they go are not in dispute. There is no question that the plaintiff performed the services sued for in connection with the funeral for the deceased. There is no question that the funeral director met with the widow of the deceased and the defendant, the brother of the deceased, to *1071 discuss funeral arrangements. There is also no question that the funeral director went over the charges which would be incurred for the funeral services. There is also no question that the funeral director took the widow and the brother into the plaintiff’s showroom and that a casket was selected which would cost $1,995. There is no question that the widow signed the form prepared by the funeral director and the funeral director wrote next to her name the notation “ Mail Bill to ” with an arrow pointing to her signature. There is also no question that the defendant signed his name under that of the widow. That is the end of agreement as to the facts.
The defendant, with much passion, testified that he was told by the funeral director that the reason his signature was requested on the document was that a witness was needed to the widow’s signature. He testified that he was in his 70’s and existed on social security payments with some supplemental income from driving a taxicab and that he had no other assets. He set forth this information in support of his testimony that he would never have signed if the purpose of the signature was to obligate him for payment of the bill. Incidentally there was a payment on account at the time of the execution of the funeral parlor agreement in the sum of $500. The defendant stated that he had not paid any money to the funeral parlor. The funeral director could only testify that a payment of $500 on account was made but he could not say who made the payment. The defendant also testified that he was present only to give his sister-in-law moral support in view of her emotional condition. The selection of the expensive casket and the other choices were made by the widow, according to the defendant. The document signed by the defendant and the widow, although it did not use the phrase “ jointly and severally liable ” did state that the funeral parlor was not relying upon the estate of the deceased for payment but looked to the signatories to the agreement for payment. The widow now resides in Florida and wrote a letter to the funeral director, presumably in response to a dunning statement or letter, advising that the funeral director should look to the brother for payment, and that the deceased had given $4,000 to his brother, the defendant, some time prior to his death. The defendant admitted receiving such sum from the deceased many years ago but testified that it was in repayment of a loan made by him to the deceased. The funeral parlor apparently made no other effort to collect from the widow, although it could have done so by use of the long-arm statute (OCA, § 404, subd. [a], par. 1).
*1072 In the opinion of this court, there must be a clearer showing in such situations so charged with sorrow, so devastating in impact on those close to the deceased, as to who is assuming the obligation to pay for the funeral expenses.
As was stated in Jones v. Caine (31 Misc 2d 942, 944):
“ First, at the time of a death in a family, the immediate circle of relatives are usually so emotionally upset that they are practically useless when it comes to making the funeral arrangements. About the only one who has his complete wits about him is the undertaker.
“ However, there is usually one person, an uncle or an aunt, or a friend, who steps forward and takes control of the entire arrangements, and becomes the family leader at this unfortunate time. Generally, there is no intention on the part of such an individual to be liable for the funeral expenses. He may intend to be held liable; however, if this be the case, his intention must be spelled out very clearly ’ ’.
Here, the testimony spells out a quite contrary intention on the part of the defendant. Admittedly, he signed the agreement, but only because plaintiff told him his signature was necessary as a witness to the signature of the widow on the agreement. Moreover, all the other relevant evidence negates, rather than confirms, the necessary intention by the defendant to become responsible for the funeral costs: there is the testimony that defendant is in his 70’s, that he exists on social security income, supplemented by income from driving a taxicab ; that he was not the person who paid $500 on account at the time of the execution of the funeral parlor form; that the funeral director wrote next to the widow’s name on the form the notation ‘ ‘ Mail Bill to ’ ’ with an arrow pointing to her signature.
“ An examination of the cases reveals that liability for funeral expenses has been strictly limited. The primary liability for such expense rests upon the decedent’s estate (Matter of Billman, 143 Misc. 765; Apostle v. Pappas, 154 Misc. 497), and is preferred over all the debts of the decedent (SOPA 1811). ” (Jaudon v. White, 60 Misc 2d 86, 88).
The provision in the funeral parlor form that plaintiff would not look to the estate but to the signatories to the agreement for payment is not, in the face of the cited facts, sufficient to depart from the general principle of primary estate liability and to impose liability upon the defendant, brother of the deceased. The provision was not prominently printed nor was it emphasized in bold or underlined type to gain the attention of individuals in the position of the defendant. Moreover, *1073 defendant was told that his signature was needed simply as a witness to the widow’s signature.
Although it is the general principle that “ The relevant contractual intent is that expressed in the contract, even though it may not accord with the subjective intent of the parties ” (Peripheral Equip. v. Farrington Mfg. Co., 29 A D 2d 11, 13) the “ contractual intent expressed in the contract ” cannot be arbitrarily divorced from the objective conduct and speech of the parties which fashioned such intent. Under the emotionally strained circumstances prevailing in the funeral parlor, the usual bewilderment of the next of kin of the deceased, the difficulty of exercising calm, considered powers of decision-making at such time, the law in good conscience requires more than the bare printed terms of an agreement furnished by the funeral parlor in order to impose extraordinary liability upon the brother of the deceased, especially since the brother’s “ intent ” in signing the agreement was effected by plaintiff’s assurance that such signature was merely as a witness to the signature of the widow. The intent claimed to be expressed in the contract by reason of defendant’s induced signature is tainted indeed, nullified, by the cited circumstances surrounding the signing by him.
If funeral directors desire to obtain written agreements fairly waiving recourse to the deceased’s estate as the primary obligor and instead binding the surviving spouse or other person to primary responsibility for payment, then such agreement should be printed in a form clearly understood, and clearly brought to the special attention of such other person, perhaps by large print or underlining or both. Moreover, in any event, a person whose signature is secured to the agreement should not be bound if he has been told by the funeral director that his signature is only that of a witness and not that of an obligor.
‘ ‘ Intent ’ ’ thus obtained will not be blindly read into the agreement and as blindly enforced in automatic obeisance to the cited general principle that “ the relevant contractual intent is that expressed in the contract ” (Peripheral Equip. v. Farrington, supra, p. 13). The salutary recent trend towards essential protection for the consumer extends to the purchaser of funeral services as well as to purchasers of goods for the living.
Judgment for the defendant, complaint dismissed.